[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Commissioner of the Department of Children and Youth Services (DCYS) filed a petition on May 19, 1988 seeking to terminate the parental rights of Gwendolyn T. in and to her minor child Jacob T. born on November 16, 1986. Although a father was named in the original petition, no father has ever been identified by the mother nor has any man ever come forward.
On February 24, 1987, the child was adjudicated uncared for and this court committed him to the custody of the Commissioner of DCYS. That commitment has been extended and remains in effect.
On May 2, 1990, the original petition was amended to add the grounds of abandonment and no ongoing parent/child relationship as defined by law to the original grounds of denial of care, guidance or control necessary for the child's well-being due to the parent's acts of commission or omission and that a prior proceeding found the child to be uncared for and that the parent. has failed to achieve rehabilitation. All four grounds are alleged to have existed for not less than one year.
The procedural structure is detailed in In re Shannon S. et al, 41 Conn. Sup. 145, 146 (1989) and is not repeated.
During the trial, DCYS introduced 39 exhibits and called as witnesses Dr. S. Cartun, a psychiatrist; Mr. David Swett and Mr. Michael Smith, DCYS social workers; Ms. Sally Threlfall, a parent aide; Mrs. Gordell Gulley, foster mother; Dr. Ralph Welsh, a psychologist; and Dr. JoAnne Burger, M.D.
The mother attended the first day of the trial and was absent CT Page 492 without explanation on the second, final day of trial. No witnesses were called by her.
The brief of DCYS sets out many statements of fact that the respondent's brief admits to be true. They are as follows and are quoted from the DCYS brief.
1. DCYS originally became involved with Jacob T. as a result of a referral from Griffin Hospital on November 24, 1986. Mother was in the emergency room with her son Jacob T. Mother appeared psychotic. (Testimony of David Swett, State's Exhibit C).
2. On December 19, 1986, DCYS obtained an Order of Temporary Custody. Mother had left the child with various caretakers. Maternal grandmother was no longer able to care for the child (Testimony of David Swett; State's Exhibit D).
3. Mother was hospitalized at Elmcrest and released in February, 1987.
4. Jacob was adjudicated uncared for and committed to DCYS on February 24, 1987. (Testimony of David Swett; see also Court file).
5. On March 25, 1987 David Swett and Gwendolyn T. entered into a service agreement to facilitate visitation in the foster home. (State's Exhibit E.)
7. On December 23, 1987 Jacob was returned home to his mother's care. (Testimony of David Swett; State's Exhibit O, P).
8. Numerous services were put in place to assist mother with Jacob's care. These services included counseling, parent aide and continued involvement with DCYS. (Testimony of David Swett; State's Exhibits O and P.)
10. Gwendolyn T. was taken to the Griffin Hospital Emergency Room on April 6, 1988. Gwendolyn T. was hospitalized for psychiatric treatment at Connecticut Valley Hospital on April 7, 1988. (State's Exhibits II, JJ.)
11. On May 19, 1988 DCYS filed for termination of Gwendolyn T's. parental rights.
12. DCYS arranged for mother to visit with Jacob on 7/25/88; 10/19/88; 11/22/88; 12/6/88; 2/9/89; 2/28/89 and 3/28/89. Mother did not recognize what milestones were age-appropriate for her child. Mother continued to feed Jacob junk food, even though she was instructed not to do so. Mother believed the child should be toilet trained at one year old. Mother believed that one year old CT Page 493 Jacob should be talking like an adult. (Testimony of David Swett.)
13. DCYS arranged for mother to have a bus pass to facilitate visitation. (Testimony of David Swett; State's Exhibits U and W.)
15. Mother failed to appear at the following scheduled visits: 11/29/88; 1/31/89; 3/07/89; 3/21/89; 4/04/89; 4/11/89 and 4/18/89. (Testimony of David Swett.)
16. Except for the Court ordered parent/child evaluation, mother last visited with Jacob on 3/28/89. (Testimony of David Swett.)
17. Mother has been hospitalized on numerous occasions as a result of her psychiatric illness. Her diagnosis has most consistently been schizo-affective disorder and substance abuse. She suffers from a chronic psychotic disorder. (State's Exhibits CC, II, JJ, KK, and LL).
22. At an updated evaluation, Dr. Cartun concluded mother had made no improvement in her capacity to maintain motivation for treatment, her compliance with out patient therapy and medication, her mental status, examination, nor in her ability to take care of her activities and to parent her child. (Testimony of Dr. Cartun, State's Exhibit MM.)
25. Jacob was placed with the Gulley family on 4/06/88. (Testimony of David Swett, Testimony of Gordell Gulley.)
26. Jacob enjoys a close, loving relationship with his foster family. (Testimony of Dr. Welsh; Testimony of Dr. Burger; Testimony of Gordell Gulley; State's Exhibits EE, GG and HH.)
27. Jacob refers to his foster parents as Mom and Dad. (Testimony of Gordell Gulley.)
In addition to the foregoing admitted facts, the court finds the following facts to have been proven and are quoted from the DCYS brief.
6. Additional service agreements were entered into to increase visitation and facilitate reunification of mother and child. (Testimony of David Swett; State's Exhibits E, F, G, I, J, K, L and M.)
19. Mother has been very inconsistent in taking her medications to treat her psychiatric illness. (Testimony of Dr. Cartun; State's Exhibit CC.) CT Page 494
20. Mother's psychiatric illness renders her totally unable to maintain a sustained relationship with Jacob. (Testimony of Dr. Cartun; State's Exhibit CC.)
21. Mother is not competent to care for Jacob. It is unlikely that she will be able to care for him in the forseeable future. (Testimony of Dr. Cartun; Testimony of Dr. Welsh; State's Exhibits CC, MM, DD and FF.)
23. Mother's long-term prognosis is discouraging. Even with medication, mother would still lack the judgment required to parent Jacob. (Testimony of Dr. Welsh, State's Exhibit DD.)
28. Jacob relates to his mother in a very cautious manner and does not know how to respond to her. Jacob's behavior regresses when he anticipates a visit with his mother. (Testimony of Dr. Welsh; Testimony of Dr. Burger; Testimony of Gordell Gulley; State's Exhibit FF and GG.)
In addition to the foregoing, the court finds that the mother's own medical diagnosis of schizophrenia as given by Dr. Ralph Welsh, is such as to prevent the mother from recognizing her shortcomings and therefore being unable to address them. As a consequence, she cannot rehabilitate herself in order to learn any of the skills necessary to care for, or even assist in caring for her son.
There is no evidence in the record to prompt the court to form a belief that within a reasonable time, considering the age and needs of the child, that Gwendolyn T. can assume a responsible position in the life of the child.
The court finds the ground defined in Section 17-43a(b)(2) to be proven by clear and convincing evidence and that such has existed over a year.
The Commissioner need prove one ground set forth in Section 17-43a(b), Connecticut General Statutes; In re Juvenile Appeal, 84-BL, 194 Conn. 252, 258; and that such termination is in the best interests of the child, In re Nicolina T., 9 Conn. App. 598,602, by clear and convincing evidence, Practice Book Section 1049.
The recent case entitled In re Barbara J., 215 Conn. 31 (1990) dealt with a mother who had a diagnosis of schizophrenia (Id., p. 37) and the expert in that case described the behavior of the mother, her disrupted thought process, and her fragmented thinking, with delusional and paranoid ideation. The explanation of Dr. Welsh in the present case is strikingly similar in describing this mother's psychosis. CT Page 495
The mother in the present case cites Article XXI of the Connecticut Constitution:
 "Article fifth of the amendments to the constitution is amended to read as follows:
 No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."
claiming that the grounds would have to be other than Section 17-43a(b)(3):
 "(3) The child has been denied, by reason of an act or acts of parental commission or ommission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being."
This court disagrees with respondent. After the child was adjudicated uncared for and committed to DCYS on February 24, 1987, the child was returned to his mother's care under DCYS supervision on December 23, 1987. On April 6, 1988, Gwendolyn T. was hospitalized for psychiatric treatment, and Jacob T. was placed in the foster home where he has remained. The court finds that the mother is unable to care for her child and it is most unlikely that this situation will change in the future.
In re Nicolina T., supra at p. 605 held that a parent's mental deficiency which interferes with necessary parenting functions can support a termination based on Section 17-43a(b)(3). In so doing, it disposed of the equal protection argument made by the respondent, and stated that the "statutory criteria" of Section 17-43a(b) applies to all parents without regard to their mental condition, and did not limit its comment to sub (3) only. It then pointed out that it is not the mental condition which furnishes the ground, but its impact upon the individual's ability to function as a parent.
Applying that test to this case, this court finds that the child has been denied the care, guidance and control necessary for his physical, educational, moral and emotional well-being based on Gwendolyn's inability to care for him and such has been proven by clear and convincing evidence. The child has made good progress CT Page 496 in developing since being placed in foster care. It is in the best interests of the child that he remain there.
The third ground addressed is lack of an on-going relationship between parent and child. The testimony of Dr. Welsh clearly indicated that the relationship is practically gone, that even when medicated Gwendolyn T. will not be able to establish a relationship with her child, that he is bonded to the foster parents, and the child,
 ". . . would be terribly, terribly damaged if he was taken out of this environment and put into this totally unpredicatable environment. . ."
with his mother. He concluded that her periods when she's relatively normal would not establish a relationship because of her total lack of insight. The child's recent responses to his mother have been negative.
The court finds both elements of Section 17-43a(b)(4) proven by clear and convincing evidence.
The final grounds of abandonment the court finds not proven by clear and convincing evidence. Although Gwendolyn T. did act inconsistently, she displaced such interest and affection as may be expected of one so detached by her illness.
The court is next directed to consider the six statutory written findings of Section 17-43a(d).
Finding 1: DCYS offered services to Gwendolyn T. beginning with a service agreement dated December 11, 1986. (Plaintiff's Exhibit A), and continuing with a series of treatment plans, which produced positive results. (c.f. plaintiff's exhibits 1, J). As noted earlier, these efforts resulted in mother and son being reunited for several months. The peak result is reflected in the treatment plan dated January 20, 1988. Even after filing the present TPR petition, DCYS continued to support visits by the mother. The court concludes that the services offered were timely, extensive and appropriate.
Finding 2: The mother complied with a court order for her to undergo a psychological and psychiatric evaluation.
Finding 3: The child has bonded to his foster parents. Any remaining feelings he has towards his mother are negative.
Finding 4: Jacob T. is 4 years one month old. CT Page 497
Finding 5: The mother has visited with the child seven times since Jacob T. was placed in foster care on April 6, 1988, the last visit on March 28, 1989. There has been little contact between the mother and the foster parents.
Finding 6: Gwendolyn T. has not been prevented from maintaining a meaningful relationship with Jacob T. by any unreasonable act or conduct by any other person. The mother's tenuous financial situation impacted her ability to travel or to communicate with DCYS or others involved. She had no telephone and was dependent on public transportation or DCYS for travel plans. Her economic circumstances hampered her but did not prevent her from maintaining a meaningful relationship with Jacob T.
The court finds, again by clear and convincing evidence, that it is in the best interests of the child to grant this petition to terminate Gwendolyn's parental rights. In addition to the testimony of Dr. Welsh commented on above, the testimony of Dr. Cartun and his reports (plaintiff's Exhibits CC and MM) are clear in recommending termination in the child's best interests.
Finally, the child's present placement appears appropriate, based on the evidence.
Having found three grounds proven by clear and convincing evidence, and that termination is in the best interest of the child by the same measure of proof, the court ORDERS that the parental rights of Gwendolyn T. in and to her son Jacob T. are hereby terminated. It is further ordered that the Commissioner of DCYS is appointed statutory parent and shall comply with the 90 day case plan report as per statute made and provided.
HARRIGAN, J.